**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DILJIT K. CHATHA.                         §
                                          §
              Plaintiff,                   §
                                          §
vs.                                       §            CIVIL ACTION NO. 4:14-cv-03234
                                          §
PRAIRIE VIEW A&M UNIVERSITY,               §
                                          §
                                          §
              Defendant.                   §

**MEMORANDUM AND RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Vanessa D. Gilmore, for full pre-

trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #8). In this case,

Plaintiff Diljit Chatha ("Plaintiff," "Chatha") brings claims against Defendant Prairie View A&M

University ("Defendant," "Prairie View," "the University") under Title VII of the Civil Rights Act

of 1964, 42 U.S.C.A. §§ 2000e, *et seq.*, as amended by the Lilly Ledbetter Fair Pay Act of 2009[1]

("LLFPA," "the Act," "the Ledbetter Act"). She alleges that Defendant discriminated against her,

on the basis of her race and her national origin, by paying her a lower salary than her African

American colleagues. Pending before the court is a motion for summary judgment, which was filed

by the University. (Defendant Prairie View A&M University's Motion for Summary Judgment

["Motion"], Docket Entry #28). Plaintiff has responded in opposition to the motion, and Defendant

has filed a reply. (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment

["Response"], Docket Entry #31; Reply Brief Supporting Defendant's Motion for Summary

Judgment ["Reply"], Docket Entry #34). After considering the pleadings, the evidence submitted,

and the applicable law, it is **RECOMMENDED** that Defendant's motion be **GRANTED**.

---

[1] 42 U.S.C. § 2000e–5(e)(3)(A).

## Background

Prairie View is a public university which was founded to promote the education of African American students. (*See* Plaintiff's Amended Original Complaint ["Amended Complaint"] at 3, Docket Entry #6; Motion at 6-7; Motion, Ex. B ["Ayyar Declaration"][2] at 1). Plaintiff is a 70-year old, non-African American female, of Indian descent. (Amended Complaint at 2). She obtained a Master's Degree in British Literature from Jodhpur University, a Master's Degree in English from Texas Christian University, and a Ph. D. in English from Texas Woman's University. (Defendant Prairie View A&M University's Motion to Dismiss Pursuant to Rules 12(B)1 and 12(B)6 ["Motion to Dismiss"], Docket Entry #7) Exhibit ["Ex."] B ["EEOC Charge 1"] at 4). On September 1, 1987, Chatha began working as an "Assistant Professor" in Prairie View's English, Foreign Languages and Communications Department,[3] for an annual salary of $31,000. (Amended Complaint at 2; *See* Motion, Ex. A ["Chatha Deposition"] at 27:15-17; Ayyar Declaration at 3; Motion, Ex. 7 ["Defendant's Interrogatory Response"] at 3). Chatha gained tenure in 1993. (Defendant's Interrogatory Response at 3). Later that year, she was promoted to Associate Professor, and to Full Professor in 2004. (*Id.*). Plaintiff claims that she has taught every undergraduate course offered in the University's English Department, as well as traditional, and online graduate courses. (Amended Complaint at 3, *see* EEOC Charge 1 at 7; Chatha Deposition at 38:20-39:4). She testified that she served as the Coordinator of English in 2002, and, in that capacity, she was assigned administrative and marketing tasks that were not assigned to other professors. (*See* Chatha Deposition at 151: 14-152:10, 152:15-153:8). Chatha stated that she has also restructured the graduate program in English,

---

[2]Radhika Ayyar ["Ms. Ayyar"] has been employed by the University since September 1, 2004, as the Assistant Director of Human Resources. On April 18, 2013, she was promoted to Director of Human Resources, and, on March 1, 2016, to Executive Director of Human Resources. (Ayyar Declaration at 1). As such, Ayyar is competent to testify on the matters related to the University's Human Resource Department policies, including faculty salary determination procedure. FED. R. CIV. P. 56(c)(4).

[3]The University's English, Foreign Languages, and Communications Department later became the Languages and Communications Department. (Chatha Deposition at 38:22-39:4). For the sake of simplicity, the court will refer to that department as the "English Department."

and that, in 2005, she received the A&M System Regent's Professor Award. (*See* Amended
Complaint at 3; Motion to Dismiss, Ex. A ["EEOC Charge 2"] at 3; EEOC Charge 1 at 6,7; Motion,
Ex. 3 ["Plaintiff's Interrogatory Response"] at 4).

Over the course of her employment with the University, Plaintiff reported receiving only
"very small" wage increases.[4] (EEOC Charge 1 at 5). In a letter dated December 17, 2011, Plaintiff
informed the University that she intended to retire in May, 2012, and she requested a reduced course
load. (Ayyar Declaration at 8). The University granted her request, even though she was the only
"Full Professor" in the English department. (Chatha Deposition at 145:2-4, 150:3-5). Plaintiff taught
only two courses that semester, a total of six academic credit hours. (Chatha Deposition at 149:18-
150:8; Ayyar Declaration at 3, 7). Despite having a reduced course load, Plaintiff received her full
base salary, $6,828.49, per paycheck, or $61,457, annually. (Ayyar Declaration at 3, 6). Chatha
retired from Prairie View on May 31, 2012. She received her last paycheck on June 1, 2012. (Chatha
Deposition at 39:16-20).

### *Complaints of Discrimination*

In 1992, Chatha wrote a letter complaining[5] that the University paid her less than some of
the African American professors who held the same, or lesser, credentials. (*See* Chatha Deposition
61:25-62:16; EEOC Charge 1 at 4). She alleges that when she requested equal pay, Prairie View
assured her that she would receive a raise when the budget allowed. (EEOC Charge 2 at 3).
However, as funds became available, Defendant failed to fulfill that promise. (*Id.*). Plaintiff alleges
that, instead, the University paid a higher salary to Mr. William Chapman ("Mr. Chapman") and Dr.
Blondell J. Freeman ("Dr. Freeman"), African American professors, of non-Indian origin, despite

---

[4]Defendant stated that Chatha's salary adjustments were determined by the head of the University's English
Department, and approved by the University's Dean of the College of Arts and Sciences. (EEOC Charge 1 at 5;
Motion, Ex. G ["Defendant's Interrogatory Response"] at 3-4).

[5]Chatha claims that, even before 1992, she suspected that other professors had received higher pay for
doing the same work. (Chatha Deposition at 61:10-62:5). However, in 1992, she says that she gained access to a
"[f]act [b]ook," which documented that she was paid a lower salary than her colleagues. (*See id.* at 64:25-65:12).

their "inferior qualification[s], [] experience[,] and [] teaching assignments[.]"(*Id*. at 2). Chatha also claims that she has been paid a lower salary than Boyd Minner ["Mr. Minner"], another professor in the English Department, Dr. Martha Bailey ["Dr. Bailey"], a professor in the Curriculum and Instruction ["Education"] Department, Dr. Loretta Foster ["Dr. Foster"], a Mathematics professor, and Dr. Clarissa Booker ["Dr. Booker"], a professor in the Education Department. (Chatha Deposition at 136:11-17, 140:15-17; Ayyar Declaration at 4-5; Motion, Ex. 3 ["Plaintiff's Interrogatory Response"] at 5).

### Colleagues in the English Department

Dr. Blondell J. Freeman received a Doctor of Arts, and began working in the Prairie View English Department in 1989. (EEOC Charge 2 at 2; Chatha Deposition 50:20-22). She became a tenured professor in 1996, and she retired from the University on August 31, 2007. (Ayyar Declaration at 4; Defendant's Interrogatory Response at 7). William Champan was hired by Prairie View in 1966, and became a tenured associate professor in 1991. (Defendant's Interrogatory Response at 7). He retired from the English Department on May 31, 2003,[6] and he died on July 3, 2014. (Ayyar Declaration at 4; Chatha Deposition at 56:11-18). At her deposition, Chatha testified that she knew that Mr. Chapman had obtained a Master's Degree in English. (Chatha Deposition at 56:9-10). Plaintiff claimed that she was paid at least $10,000-$12,000 less than Dr. Freeman and Mr. Chapman.[7] (Plaintiff's Interrogatory Response at 4). Boyd Minner, another professor in Prairie View's English Department, held a graduate degree, and he retired from the University on July 31, 2001. (Ayyar Declaration at 4; Plaintiff's Interrogatory Response at 6).

---

[6]In Interrogatory Responses, the University reported that Mr. Chapman retired from Prairie View on July 3, 2005. (Defendant's Interrogatory Response at 7).

[7]Chatha does not specify when the alleged pay disparity between her salary and the salaries of Dr. Freeman and Mr. Chapman existed.

***Professors Outside of the English Department***

Dr. Martha Bailey, a professor in the University's Education Department, retired on August 31, 2008. (*Id*.).[8] Dr. Clarissa Booker, another professor in the University's Education Department, also serves as the Coordinator of Reading Programs. (Ayyar Declaration at 4). Dr. Booker earned a Master's Degree in Reading from the University of Northern Colorado, and holds a Doctor of Education in Reading from the University of Houston. (*Id*.). During the 2011-2012 academic year, she taught a full, twelve hour, academic course load. (*Id*. at 4, 10-15). Plaintiff contends that her own "contribution to [the University's] Teacher Education program is comparable" to Dr. Booker's, but that, on average, Dr. Booker's salary was $25,000-$30,000 higher than her own. (Plaintiff's Interrogatory Response at 4; *see also* Chatha Deposition at 159:15-20).

Dr. Laurette Foster is a professor in the University's Mathematics Department. (Ayyar Declaration at 4). She obtained a Master's Degree in Mathematics Education from Virginia State College, and a Doctorate of Education in Mathematics Education from the University of Houston. (*Id*.). During the 2011-2012 school year, Dr. Foster taught the equivalent of fifteen academic credit hours. (*Id*. at 4-5). In addition to teaching two classes, she managed the Center for Teaching Excellence and the Quality Enhancement Program in the Office of Academic Affairs. (*Id*.). Under the University's compensation policy, Dr. Foster was entitled to additional pay for teaching more than the typical, twelve credit hour course load. (*Id*.). Plaintiff testified that she was unsure of Dr. Foster's salary in Spring, 2012, but conceded that, generally, math professors are paid more than English professors. (Chatha Deposition 144:18-23, 149:16-150:9).

---

[8]Ms. Ayyar testified that additional information regarding the education, experience, and salaries of Dr. Freeman, Chapman, Minner, and Dr. Bailey is unavailable, because their personnel files have been deleted, in compliance with the University's information retention policy. (Ayyar Declaration at 2).

*Procedural History*

### First EEOC Complaint

According to Plaintiff, she did not file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") immediately after learning that she was paid less than her colleagues, because she wanted to focus on her teaching. (Chatha Deposition at 63:9-13, 68:15-69:7). Chatha also testified that she chose not to file an EEOC claim then, because she thought that doing so would be "too much of a hassle[.]" (Chatha Deposition at 74:21-75:1, 102:15-19). However, on September 25, 2006, Plaintiff did file her first complaint with the EEOC. (*See* Motion to Dismiss at 7; s*ee, generally* EEOC Charge 1). In that complaint, she alleged that Prairie View had discriminated against her on the basis of her race and her national origin. (EEOC Charge 1 at 3). In support of that allegation, she claimed that she was the lowest paid professor in the College of Arts and Sciences; that she was the lowest paid full professor at the University; and that she was the lowest paid member of the University's graduate council. (*Id.*). She claimed further that she was a senior faculty member in name only, and that preferential treatment had consistently been given to junior faculty members in regard to scheduling and summer employment. Chatha did not allege any retaliation. On June 28, 2007, the EEOC issued Chatha a right-to-sue-letter on her stated claims. (Motion to Dismiss at 7, Motion to Dismiss at Ex. C ["Right to Sue Letter 1"]).

### State Law Suit

On November 1, 2007, Plaintiff filed a lawsuit against Prairie View in state court. *See Chatha v. Prairie View A&M University*, Civil Action No. 071119090 (155th Jud. Dist. Ct., Waller County, Tex., Nov. 1, 2007). In that state court petition, Chatha made claims against the University for race and national origin discrimination under the Texas Labor Code. (*Id.*). She also stated, explicitly, that she "does not assert any federal claims in this proceeding." (*Id.*). In response, Defendant filed  a plea to the jurisdiction, alleging that Plaintiff's EEOC charge was untimely,

because it was not filed within the 180-day limitations period imposed by § 21.202 of the Texas Labor Code. *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 504 (Tex. 2012). The trial court denied Prairie View's plea. (*See* Motion, Ex. 9 ["Order Denying Defendant's Plea to the Jurisdiction"]). Defendant brought an interlocutory appeal of that decision, which was also denied. *Prairie View A&M Univ. v. Chatha*, 317 S.W.3d 402 (Tex. App.– Houston [1st Dist.] 2010). The Texas Supreme Court reversed the appellate court decision, holding that Chatha had failed to timely file her complaint with the Texas Workforce Commission (TWC), and that, as a result, her suit against Prairie View was jurisdictionally barred. *Id.*

### Second EEOC Complaint

On March 27, 2013, Plaintiff filed a second charge of discrimination with the EEOC. (*See* EEOC Charge 2).[9] In that complaint, Chatha raised similar allegations against the University, again claiming that Prairie View had discriminated against her on the basis of her race and her national origin. (*See id.*). On August 15, 2014, the EEOC issued Chatha a right-to-sue-letter on her stated claims. (Plaintiff's Response to the Court's Order to Clarify the Date of the Second Notice of Right to Sue Letter ["Plaintiff's Clarification"] at 1, Docket Entry #16). Plaintiff received the right-to-sue letter no later than August 21, 2014. (*Id.*).

### Federal Law Suit

On November 11, 2014, Plaintiff filed an original action against Prairie View in federal court. (Plaintiff's Original Complaint ["Original Complaint"], Docket Entry #1). In that complaint, Plaintiff stated claims for race and national origin discrimination, as well as for retaliation, under Title VII, as amended by the Ledbetter Act. (*Id.* at 3). On December 16, 2014, Plaintiff amended her complaint to include additional information regarding Mr. Chapman and Dr. Freeman, the African American professors named in the Original Complaint. (Amended Complaint at 3). Chatha again

---

[9]Chatha was last paid by Prairie View on June 1, 2012,which is less than 300 days from the date on which she filed her second EEOC charge. (Amended Complaint at 3; *see also* Motion to Dismiss at Ex. A).

alleged that her colleagues had less experience, and fewer credentials than she did, but that they nevertheless received higher salaries. (*Id.*). Plaintiff did not mention Dr. Booker, Dr. Bailey, Dr. Foster, or Mr. Minner anywhere in her amended complaint.

On January 16, 2015, Defendant filed a motion to dismiss Plaintiff's claims, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). On September 28, 201, the court granted Defendant's motion, in part, dismissing Plaintiff's retaliation claim, and any discriminatory pay claims that arose before March 27, 2011. (Docket Entry #22). To the extent that Plaintiff has alleged any unequal pay claims that date after March 27, 2011, those claims remain at issue.

Defendant now moves for summary judgment. In support of its motion, the University contends, at the outset, that Chatha cannot establish a *prima facie* case of wage discrimination, because she has not identified any valid comparators to substantiate her claims. (Motion at 10-18). On this point, Defendant makes several arguments. First, Prairie View contends that Plaintiff's claims involving Dr. Freeman and Mr. Chapman must be dismissed, because they were not employed by the University during the relevant period. (*Id*. at 10-12). Next, the University argues that Chatha cannot establish that either Dr. Booker or Dr. Foster were "similarly situated" to her. (*Id*. at 14-18). Prairie View also insists that it had legitimate, nondiscriminatory reasons for its wage decisions. (*Id*. at 17-18). Finally, Defendant contends that Plaintiff's claims are barred by the doctrine of laches. (Motion at 18-20). Having reviewed the pleadings, the evidence, and the applicable law, the court recommends that Defendant's motion should be granted.

**Standard of Review**

Summary judgment is appropriate if "'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant [is] entitled to judgment as a matter of law.'" *Pustejovsky v. Pliva, Inc*., 623 F.3d 271, 275-76 (5th Cir. 2010) (quoting FED. R. CIV. P. 56(c); citing *Breaux v. Halliburton Energy Servs*.,

562 F.3d 358, 364 (5th Cir. 2009)). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted).

Under Rule 56(c), the moving party bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001); *see Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). "The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the non-movant's case." *Mack v. Equable Ascent Financial, L.L.C.,* 748 F.3d 663, 665 (S.D. Tex. 2014) (citations omitted); *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "'If the moving party fails to meet its initial burden, its motion for summary judgment must be denied, regardless of the non-movant['s] response.'" *Exxon Mobil Corp. v. U.S.*, Nos. H-10-2386, H-11-1814, 2015 WL 3513949, *at 15 (S.D. Tex. June 4, 2015) (quoting *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002).

If the moving party meets its Rule 56 burden, however, the non-moving party cannot merely rest on the allegations in its pleadings. *See Lincoln*, 401 F.3d at 349-50; *see also Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir. 2001). Rather, she is required to "'go beyond the pleadings'" and produce probative evidence to show "'that there is a genuine issue for trial.'" *Kee*, 247 F.3d at 210 (citations omitted); *Boudreaux*, 402 F.3d at 540; *see Izen v. Catalina*, 398 F.3d 363, 366 (5th Cir. 2005). If she does so, her evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir. 2003); *see Hillman,* 697 F.3d at 302. If the non-movant fails to respond appropriately, or if she fails to respond at all,

summary judgment is not awarded to the moving party simply by default. *See Ford-Evans v. Smith*, 206 Fed. Appx. 332, 334 (5th Cir. 2006); *see also Day v. Wells Fargo Bank Nat. Ass'n*, 768 F.3d 435, 435 (5th Cir. 2014). Instead, as always, summary judgment is appropriate only if the moving party has demonstrated the absence of a genuine issue of material fact, and shown that judgment is warranted as a matter of law. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006); *Day,* 768 F.3d at 435.

## Discussion

### *Discrimination Claim*

Title VII provides, among other things, that it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race . . . or national origin." 42 U.S.C.A. § 2000e-2(a)(1). Prior to filing an action in district court, a plaintiff must file a charge of discrimination with the EEOC within 180 days of learning of the unlawful conduct.[10] 42 U.S.C.A. § 2000e-5(e)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002), cert. denied, 537 U.S. 1200, 123 S.Ct. 1287, 154 L.Ed.2d 1041 (2003) (quoting *Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996)). Because Texas has a state agency to resolve civil rights complaints, it is a "deferral state" in which Title VII extends the filing period for discrimination claims to 300 days. 42 U.S.C.A. § 2000e-5(e)(1); *Blasingame v. Eli Lilly and Co.*, No. H-11-4522, 2013 WL 5707324, at *4 (S.D. Tex. 2010) (citing *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998)). There are instances, however, in which a claimant is unaware that a compensation decision was made with discriminatory intent until it is too late to file a complaint. *See Almond v. Unified School District No. 501*, 665 F.3d 1174,

---

[10]Under a work-sharing agreement between the EEOC and the Civil Rights Division of the Texas Workforce Commission, whenever the EEOC receives a charge of discrimination, "the [TWC], for all legal and practical purposes, [also] receive[s] the charge." *Brooks v. Firestone Polymers, LLC*, No. 1:12-cv-325, 2014 WL 4792653, at *10 (E.D. Tex. 2014) (citing *Griffin v. City of Dallas*, 26 F.3d 610, 612-13 (5th Cir. 1994)).

1183 (10th Cir.2011), cert denied., — U.S. — , 133 S.Ct. 317, 184 L.Ed. 2d 155 (2012) (quoting H.R. Rep. No. 110-237, at 7 ("Unlike hiring, firing, promotion, and demotion decisions where an individual immediately knows that she has suffered an adverse employment action, there is often no clearly adverse employment event that occurs with a discriminatory pay decision."). In 2009, Congress enacted the *Ledbetter* Act[11] to provide a remedy in those situations. The Act amended Title VII's provision on the time in which to file an EEOC charge alleging wage discrimination, specifically, stating that an:

> "Unlawful employment practice" "occurs" (1) "when a discriminatory compensation decision or other practice is adopted," (2) "when an individual becomes subject to a discriminatory compensation decision or other practice," and (3) "when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 § 2000e-5(e)(3)(A).[12]

The Act made paychecks that perpetuate past discrimination actionable, "not simply because they relate[] to a decision made outside the charge-filing period, but because they discriminate anew each time they issue." *Ledbetter*, 550 U.S. at 647, 127 S.Ct. 2162 (Ginsburg, J., dissenting) (quoting *Bazemore v. Friday*, 478 U.S. 385, 395-96, 106 S.Ct. 3000, 92 L.Ed. 2d 315 (1986)). Under the LLFPA, any paycheck issued under a discriminatory pay structure constitutes an independent, actionable, employment practice. *Blasingame*, 2013 WL 5707324, at *4 (citing *Almond,* 665 F.3d

---

[11]Congress enacted the Ledbetter Act in response to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed. 2d 982 (2007), in which the plaintiff asserted claims for sex discrimination under Title VII and the Equal Pay Act of 1963, 29 U.S.C. § 206(d). Ledbetter alleged that she received negative performance reviews because of her sex, and that her wages were affected by those past evaluations. *See Ledbetter*, 550 U.S. at 622, 127 S.Ct. 2162. Each of the allegedly discriminatory evaluations, however, occurred more than 180 days before the plaintiff filed her EEOC charge, and so she relied on the paycheck accrual rule to show that her claims were timely. Ledbetter argued that each time she was paid less than her male comparators, because of a discriminatory evaluation, the payment constituted a separate and discrete wrong that triggered a new Title VII limitations period. *Id.* at 625, 127 S.Ct. 2162. The United States Supreme Court ultimately rejected Ledbetter's argument, and held that her cause of action was untimely, because the discriminatory pay-setting decision occurred outside of the limitations period. *Id.* at 621, 127 S.Ct. 2162.

[12]Congress also explicitly provided that the Act applies retroactively to all claims pending on, or after, May 28, 2007. Pub. L. 111–2, § 6.

at 1180); *see also Wang v. Prudential Insurance Co. of America*, No. 3:09-cv-1309-O-BF, 2010 WL 1640182, at *4 (N.D. Tex. 2010) ("The Ledbetter Act simply renews a plaintiff's cause of action each time she receives a discriminatory paycheck.").

Here, Chatha's claims fall under the Act, because they allege "discriminatory compensation decisions," that are based on wages which result from those decisions. *See Blasingame*, 2013 WL 5707324, at *4. Prairie View makes no persuasive arguments for not applying the Act to Plaintiff's federal discrimination claims. The University contends, however, that Chatha cannot state a *prima facie* case of discrimination under the Ledbetter Act.

### Prima Facie Case

A Title VII discrimination claim based on circumstantial evidence is analyzed under the *McDonnell Douglas* burden-shifting framework. *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012). To survive a proper summary judgment motion, a plaintiff must first present a *prima facie* case of discrimination. *Id.* Upon a showing of a *prima facie* case, an inference of discrimination is established, and "'the burden shifts to the employer to show a legitimate, nonretaliatory reason'" for the adverse employment action.[13] *Reed*, 701 F.3d at 439 (quoting *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011)); *see Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346-47 (5th Cir. 2013). If the employer meets its burden, then the burden shifts back to the plaintiff to make an ultimate showing that the employer's proffered reason is pretextual. *Id.*; *see Autry*, 704 F.3d at 347; *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011).

To make out a *prima facie* case of compensation discrimination, Chatha must prove that she was a (1) "member of a protected class," who was (2) "paid less than a non-member[,]" for (3)

---

[13] "The employer's burden is one of production, not persuasion, and does not involve a credibility assessment." *Black*, 646 F.3d at 259; *see Reeves*, 530 U.S. at 142. Accordingly, an employer can meet this burden solely by producing evidence that, "if believed by the trier of fact, would support a finding that unlawful [discrimination] was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

"work requiring substantially the same responsibility." *Taylor v. United Parcel Service, Inc.*, 554 F.3d 510, 522 (5th Cir. 2008). There is no dispute in this instance that Chatha, an Indian female, is a member of a protected class. *See* 42 U.S.C. § 2000e–2(a). It is further undisputed that she was paid less than the other professors whom she has identified. (*See* Motion, Ex. B-1 ["Chatha's 2012 Earning Statements"], *Id.*, Ex. B-5 ["Chatha's 2011-12 Total Compensation"]; Response at 5; Plaintiff's Interrogatory Response at 4; Defendant's Interrogatory Response at 3, 7). Given these facts, Chatha has established the first two elements of a *prima facie* case of compensation discrimination. *See Jones v. Chevron U.S.A., Inc.*, 932 F.Supp.2d 794, 796-97 (S.D. Tex. 2013). The issue before the court, then, is whether she has presented sufficient evidence to show that a "similarly situated" employee, outside of her protected class, was treated differently from the way that she was treated. *See id.* at 797.

### *"Similarly Situated"*

A plaintiff claiming disparate treatment in pay under Title VII must show that her "circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class." *Taylor,* 554 F.3d at 523 (quoting *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991); *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Although the Fifth Circuit has made clear that "nearly identical" is "not synonymous with 'identical[,]'" courts in this circuit have defined "'similarly situated' narrowly." *Brown v. Board of Trustees Sealy Independent School Dist.*, 871 F.Supp.2d 581, 593 (S.D. Tex. 2012). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor [,] or had their employment status determined by the same person, and have essentially comparable [disciplinary] histories." *Turner v. Kansas City Southern Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (internal quotations omitted). In *Lee v. Kansas City Southern Ry. Co.*, the Fifth Circuit held that

"[e]mployees with different supervisors, who work for different divisions of a company [] generally will not be deemed similarly situated." *Lee*, 574 F.3d at 259 (citing *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000)). The court has also stated, "[l]ikewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated." *Id.* at 259-60 (citing *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990)). The *Lee* court concluded that, if "the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer, the employees are not 'similarly situated' for purposes of an employment discrimination analysis." 574 F.3d at 260.

### *Retired Professors*

To establish her *prima facie* case, Chatha alleges that a number of non-Indian professors who worked at Prairie View were paid higher salaries than she was paid for performing substantially similar work. (*See* Amended Complaint at 3; Plaintiff's Interrogatory Response at 5; EEOC Complaint 2). However, at her deposition, Chatha testified that Dr. Freeman, Mr. Chapman, and Mr. Minner were retired between March 27, 2011, and June 1, 2012, the period for which she can obtain relief based on her claim of discriminatory compensation.[14] (Chatha Deposition at 50:20-51:1, 56:21-23, *see* Plaintiff's Interrogatory Response at 5; Ayyar Declaration at 4) (retired 2007, 2003, and 2001 respectively). The evidence is likewise clear that Dr. Bailey was retired as of March 27, 2011, as well. (Ayyar Declaration at 4; Plaintiff's Interrogatory Response at 4) (retired 2008). For that reason, Defendant insists that these professors are not "similarly situated" employees, because they were no longer teaching at the University during that time. (*See* Motion at 10-12). Here, to state a

---

[14]For a compensation discrimination claim that is timely filed, a plaintiff may recover "back pay for up to two years preceding the filing of the charge," if the unlawful employment practices that occurred during the filing period are "similar or related" to the discriminatory compensation practices that occurred outside the time for filing a charge. 42 U.S.C.A § 2000e-5(e)(3)(B). Here, Plaintiff filed a second charge of discrimination with the EEOC on March 27, 2013, which was, 299 days following the date on which she was last paid. (*See* EEOC Charge 2). At most, Chatha can obtain relief from March 27, 2011 to June 1, 2012, the last date of pay.

proper claim under the Ledbetter Act, Chatha must show that, between March 27, 2011, and June 1, 2012, she was paid less than another, similarly situated professor was *paid during that period*. *See* 42 § 2000e-5(e)(3)(A) (An "unlawful employment practice" "occurs" "when an individual is affected by [the] application of a discriminatory compensation decision. . . including each time . . . compensation is paid[.]"). Because Dr. Freeman, Mr. Chapman, Mr. Minner, and Dr. Bailey retired well before March 27, 2011, it seems apparent that any claims based on a pay disparity between Plaintiff and those professors are time barred.[15] Because the court previously found that all of Chatha's claims which arose before March 27, 2011, are time-barred, any claims based on pay disparities from before that date are likewise barred. Indeed, Chatha "cannot base a disparate pay claim on an alleged discriminatory pay disparity that is not within the statute of limitations." *Anthony v. Galveston County, Tex.*, No. 3:12-CV-00263, 2014 WL 109352, at *4 (S.D. Tex. Jan. 10, 2014) (LLFPA did not save claims of a plaintiff who sought to use former co-worker as comparator, when co-worker had stopped working for defendant employer years prior to limitations period).

### *Drs. Booker and Foster*

Defendant also contends that Dr. Booker and Dr. Foster were not similarly situated to Plaintiff, because they worked for different academic departments and under different supervisors. (Motion at 14-16). Further, the University alleges that these professors maintained a heavier course load than Chatha did during the relevant period. (*Id*. at 16-17). In response, Plaintiff argues only that Prairie View has not "show[n] that merely teaching different subjects does not make one a true peer." (Response at 6).

The court is persuaded that Dr. Booker and Dr. Foster were not similarly situated to Chatha. It is generally accepted that professors who work in different academic departments are not similarly

---

[15]A district court may grant summary judgment on any factual ground shown by competent evidence of record, even if that ground is not specifically raised by the movant. FED. R. CIV. P. RULE 56(c); *Atkins v. Salazar,* 677 F.3d 667, 680 (5th Cir. 2011).

situated employees for Title VII purposes. *Turner*, 2015 WL 1014331, at *7; *see Welch v. Mercer Univ.*, 304 Fed. App'x 834, 837 (11th Cir. 2008) (employees working in different academic department with different standards for promotion were not valid comparators); *Hossain v. Steadman*, 855 F.Supp.2d 1307, 1314 (S.D. Ala. 2012) (co-workers from different academic departments were not similarly situated). Courts have acknowledged that working in different academic disciplines within a university typically requires distinctive skills, and so any comparison under Title VII is inappropriate. *See Mullenix v. Forsyth Dental Infirmary for Children*, 965 F.Supp. 120, 139 (D. Mass. 1996) (citing *Strag v. Bd. of Trustees, Craven Cnty. Coll.*, 55 F.3d 943, 950 (comparing employees in different academic departments in university was improper, because departments required distinctive skills). Here, Dr. Booker worked for the Education Department and Dr. Foster worked for the Mathematics Department, while Plaintiff was teaching in the English Department throughout her career. (Ayyar Declaration at 4). As Prairie View colleagues, they may have shared *some* responsibilities, but, as professors of discrete academic disciplines, each possessed unique skills, which made her more suited to instruct her subject matter of choice. In fact, Plaintiff conceded that teaching mathematics and teaching English require different skills, and that she "would not be qualified to teach a math class[.]" (Chatha Deposition at 141:8-14). She also acknowledged that "math [p]rofessors generally make a higher salary than English [p]rofessors[.]" (*Id*. at 139:16-25).

While Chatha later claimed that her contribution to the University's Teacher Education program mirrored Dr. Booker's, she has not presented any evidence to show that she "[performed] the same job or responsibilities," as Dr. Booker did, which is required for a finding of "nearly identical circumstances." (Plaintiff's Interrogatory Response at 4). *Turner*, 675 F.3d at 893; *Lee*, 574 F.3d at 259 (employees who have different work responsibilities are not similarly situated). That

being said, however, the court does not dispute that Plaintiff may have made a significant contribution to Prairie View's academic community.

Further, each academic department at Prairie View is supervised by a different department head. (Ayyar Declaration at 2). Each department head is then responsible for "the administration and supervision of his or her own department[,]" including the salary negotiations of its faculty. (*Id.*; *see* Defendant's Interrogatory Response at 3-4). In *Lee*, the Fifth Circuit was explicit that "employees with different supervisors, who work for different divisions of a company . . . will not be deemed similarly situated." 574 F.3d at 259 (citing *Wyvill*, 212 F.3d at 302). The same rationale applies in the university setting. It is undisputed that Dr. Booker, Dr. Foster, and Chatha each taught in different departments, and each was under the supervision of a different department head. For that reason, their salaries were determined by different supervisors. (Ayyar Declaration at 2; Defendant's Interrogatory Response at 4). Plaintiff claims, however, that "Defendant [] fails to offer any evidence that the provost and the president of the University are *not* involved in the pay decisions of the faculty[.]" (Response at 6) (emphasis added). However, Chatha has not presented any evidence to show that those administrators are involved in faculty salary determinations, in any way. While it is true that, in deciding a motion for summary judgment, "all reasonable inferences are [drawn] in favor of the nonmoving party[,]" a plaintiff may not "defeat summary judgment with conclusory allegations [and] unsubstantiated assertions [only.]" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007); *Davis v. Ft. Bend Cnty.*, 765 F.3d 480, 484 (5th Cir. 2014). On this record, it is clear that Dr. Booker, Dr. Foster, and Chatha worked under the supervision of different academic department heads. For that reason, they should not be treated as similarly situated employees.

Further, it is clear in the Fifth Circuit that, if "the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received

from the employer, the employees are not 'similarly situated' for purposes of an employment discrimination analysis." *Lee*, 574 F.3d at 260. Here, Prairie View maintains that Dr. Booker and Dr. Foster are not similarly situated to Plaintiff, because of the additional work that they performed at the University, outside of the classroom. (*See* Motion at 16-17). In the Spring, 2012 semester, Plaintiff taught only six academic hours, or half of the typical, twelve credit hour teaching load. (Ayyar Declaration at 3). Dr. Booker, on the other hand, taught twelve academic credit hours, and worked as the Coordinator of Reading Programs for the Education Department, that year. (*Id*. at 3-4). Plaintiff served as the Coordinator for the English Department in 2002, and testified that, in her experience, the Coordinator position requires "a lot of extra work [] on top of being a [p]rofessor[.]" (Chatha Deposition 152:21-25). Prairie View has shown that this "extra work performed by [Dr. Booker]" accounts for the wage disparity between she and Plaintiff. (Motion at 17).

Dr. Foster likewise assumed a leadership role outside of the classroom. In 2011-2012, in addition to teaching two academic classes, she managed the Center for Teaching Excellence and the Quality Enhancement Program in the Office of Academic Affairs. (Ayyar Declaration at 4-5). That position, in combination with her classes, was the equivalent of fifteen credit hours. The University insists that, under its compensation policy, Dr. Foster was entitled to additional pay for carrying that heavy course load. (*Id*.). Plaintiff has not responded in any way to Defendant's claim that the pay disparity among Dr. Booker, Dr. Foster, and herself is attributed to their extra work. In fact, she testified to the difficulty of the work required of a department coordinator, while maintaining a regular teaching schedule. (Chatha Deposition 152:21-25). Given these facts, Dr. Booker and Dr. Foster cannot be said to have been similarly situated to Plaintiff. *Lee*, 574 F.3d at 260.

On this record, it is apparent that Dr. Booker, Dr. Foster, and Plaintiff all "[worked under] different supervisors, [] in different departments [of the University.]" *See Lee*, 574 F.3d at 259. Their circumstances are not "nearly identical," and these differences account for any difference in

treatment. *See id.*  As a result, Plaintiff has not shown that Dr. Booker and Dr. Foster are "similarly situated" to her, for purposes of her race and national discrimination claim. *See id.* Plaintiff, then, has not established the third element of her *prima facie* case of race and national origin discrimination. *See Turner*, 675 F.3d at 892-93; *Taylor*, 554 F.3d at 522.

Even assuming that Chatha could establish a prima facie case of discrimination based on her race or her national origin, Prairie View has articulated several legitimate reasons for paying her less than Drs. Booker and Foster. First, the University proffers that the disparity is based on the differences in the market for each of the academic disciplines. (Motion at 17). The University's Executive Director of Human Relations testified that the salaries of English and Literature professors ranked below that of Education and Mathematics professors, nation-wide. (Ayyar Declaration at 5). Ms. Ayyar also attributes the salary disparities to the needs of the various academic departments at the University, and to the extra work Dr. Booker and Dr. Foster performed during the 2011-2012 school year. (*Id.*).

### *Laches*

Even had Plaintiff established a *prima facie* case of discrimination, Defendant contends that her claims are barred by the doctrine of laches, because she learned of the alleged wage discrimination in 1992, yet she waited fourteen years to file an EEOC complaint. (*See* Motion at 18-20). The University alleges that it has suffered substantial prejudice due to Chatha's delay in filing her claims. (*Id.* at 20). Plaintiff insists that Prairie View may not raise the defense of laches, although her argument on that point is not clear.[16] (*See* Response at 7, 11). Chatha also contends that Prairie View has not shown that it was prejudiced by any delay in the filing of her claim. (*Id.*).

---

[16]Plaintiff contends that the doctrine of laches might be available on a "'discrete' event claim[]," but that it would not be available in this case, because under the Ledbetter Act, "the issue of unequal pay arises again and again, each time the [employee] receives [an] unequal paycheck." (Response at 11). However, under the LLFPA, a discrete "unlawful employment act" occurs, each time an employee is paid. *See* 42 § 2000e-5(e)(3)(A).

Although the LLFPA does provide a means for "employees to challenge discrimination 'that extend[s] over long periods of time,' . . . [the Act] 'does not leave employers defenseless' against unreasonable or prejudicial delay.'" *Ledbetter*, 550 U.S. at 657, 127 S.Ct. 2162 (Ginsburg, J., dissenting) (quoting *Nat'l Railroad Passenger Corp., v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed. 2d 106 (2002). Employers who are disadvantaged by such delay, may raise various defenses, including waiver, estoppel, equitable tolling, or laches to block an employee's suit. *Id.* (citing *Morgan*, 536 U.S. at 122, 122 S.Ct. 2061). Permitting employers to invoke these doctrines "allow[s] [the court] to honor Title VII's remedial purpose without negating the particular purpose of the filing requirement, to give prompt notice to the employer." *Morgan*, 536 U.S. at 121, 122 S.Ct. 2061 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)). Indeed, a party who has "improperly" and "substantially" prejudiced her adversary, may not be entitled to the relief sought, not for lack of a meritorious claim, but because of her imprudent pursuit of that claim. *See id.* (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 45 L.Ed. 2d 280 (1975). In such a case, the court should exercise its discretion to "locate 'a just result[,]'" given the particular facts of the case. *Id.* (quoting *Moody*, 422 U.S. at 424-25, 95 S.Ct. 2362).

Because Chatha's claims fall under the LLFPA, the University is entitled to raise laches as a defense to the allegations. Indeed, the Ledbetter Act merely changed the definition of "occurs" in the context of a Title VII wage discrimination action. *See* 42 § 2000e-5(e)(3)(A). It did not diminish the court's discretion to apply equitable doctrines that toll or limit the time for filing a discrimination claim. *Morgan*, 536 U.S. at 122,122 S.Ct. 2061. In fact, in the *Ledbetter* dissent, Justice Ginsberg suggested that a plaintiff who, having full knowledge of an employer's discriminatory compensation decision, yet chose to wait twenty years to bring such claims, would not be saved by the paycheck

accrual rule. 550 U.S. at 658, 127 S.Ct. 2162. For that reason, the court must decide whether Prairie View has shown that Chatha's conduct here warrants dismissal under the doctrine of laches.

Laches is an affirmative defense which must be pled and proven by the defendant. FED. R. CIV. P. 8(c). It is described as "an inexcusable delay that results in prejudice to the defendant." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 622 (5th Cir. 2013) (*Board of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 489 (5th Cir. 2008), *cert. denied* — U.S. —, 134 S.Ct. 88, 187 L.Ed.2d 254 (U.S. 2013). The defense was founded on the notion that "equity aids the vigilant and not those who slumber on their rights." *Nat'l Ass'n of Gov't Employees v. City of Public Serv. Board of San Antonio*, 40 F. 3d 698, 708 (5th Cir. 1994) (quoting *NAACP v. NAACP Legal Defense & Educational Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed. 2d 623 (1985). To succeed on a defense of laches, a defendant must show that (1) the plaintiff delayed its assertion of a right of action; (2) the delay was not excused; and (3) the defendant's ability to present an adequate defense was unduly prejudiced by the delay. *Johnson v. Crown Enter., Inc.*, 398 F.3d 339, 344 (5th Cir. 2005). The "laches inquiry" is essentially factual, in which the court assesses the combined effect of the plaintiff's delay and the prejudice resulting to the defendant. *See Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 (5th Cir. 1982) (stating that "Laches = Delay x Prejudice). The discretion that the court enjoys in deciding the issue of laches is "considerable[,]" however the requirements of Rule 56(c) must be met before granting a motion for summary judgment. *New Century Financial, Inc. v. New Century Financial Corp.*, No. C-04-437, 2005 WL 2453204, at *10 (S.D. Tex. Oct. 4, 2005).

### *Delay*

"The relevant time period to analyze delay for laches purposes may be terminated by a plaintiff's notification to a defendant that the latter's actions are objectionable." *York Group, Inc. v. York Southern, Inc.*, Civ. No. H-06-0262, 2006 WL 2883373, at *3 (S.D. Tex. Oct. 10, 2006)

(citing *Armco Inc., v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1162 (5th Cir. 1982). In the context of an employment discrimination case, the period during which conciliation efforts are ongoing should not be counted against the claimant in calculating the length of delay. *Nat'l Ass'n of Gov't Employees*, 40 F.3d at 708. Here, Plaintiff testified that she first learned that she was paid an unequal wage in 1992, almost twenty-five years ago. (Chatha Deposition at 64:25-65:12). She waited until fourteen years later, on September 25, 2006, to file her first EEOC complaint, and she filed her state lawsuit one year after that. (*See* Motion to Dismiss at 7; EEOC Charge 1). On March 27, 2013, Plaintiff filed a second charge of discrimination, and she received a right-to-sue letter, in August, 2014. A suit was filed on November 11, 2014. (*See* Motion to Dismiss at Ex. A).

Historically, courts have held that the doctrine of laches may preclude litigation, only if a plaintiff has unreasonably delayed filing a suit *after* the EEOC conciliation process has been completed. *Morgan*, 536 U.S. 121, 122 S.Ct. 2061 (emphasis added); s*ee Fowler v. Blue Bell Inc.*, 596 F.2d 1276, 1279 (5th Cir. 1979). As applied here, however, that rule operates to create the precise circumstances that the *Ledbetter* majority cautioned against in rejecting Ms. Ledbetter's claim.[17] Indeed, it appears that Plaintiff "had full knowledge[18] of the circumstances surrounding the [allegedly discriminatory pay decisions] at the time[,]" yet she waited fourteen years to file an EEOC complaint. *Ledbetter*, 550 U.S. 658, 127 S.Ct 2162. As Justice Ginsburg noted, "no sensible judge would tolerate such [] neglect." *Id.* (citing *Morgan*, 536 U.S. at 121, 122 S.Ct. 2061). On this record, it is clear that the delay between the date on which Plaintiff learned of the alleged

---

[17]The *Ledbetter* majority described a hypothetical plaintiff who filed a discriminatory pay claim, pursuant to the paycheck accrual rule, that was based on "a single discriminatory pay decision made 20 years ago [that] continued to affect [the plaintiff's] pay today[], [notwithstanding the fact that] the plaintiff had full knowledge of all the circumstances relating to the 20-year-old decision at the time it was made." *Ledbetter*, 550 U.S. at 639, 127 S.Ct. 2162.

[18]It is important to note that, beginning in 1992, Chatha had access to her colleagues' salary information, because Prairie View is a public university. The defendant in *Ledbetter*, however, maintained a policy by which it's employees' salary information remained confidential. This difference is critical, because Ledbetter was in a poor position to learn of any unfair pay practices, while Chatha had a wealth of information regarding the University's pay policies at her disposal, yet she chose not to act on it for more than a decade.

discriminatory conduct, and the date that her complaint was filed is substantial. *See Garden City Boxing Club, Inc. v. Johnson*, 552 F.Supp.2d 611, 618 (N.D. Tex. 2008) ("[s]imilar to the discovery rule, the period for latches begins to run when the plaintiff knew or should have known of the alleged illegal activity"). Accordingly,  Defendant has presented sufficient evidence to show that Plaintiff delayed in asserting her rights under Title VII.

### Excusable Delay

To determine whether the delay at issue is excusable, a court must consider and weigh any justification that is offered by the plaintiff. *Shell Global Solutions (US) Inc. v. RMS Engineering, Inc*., 782 F.Supp.2d 317, 327 (S.D. Tex. 2011) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020,1033 (Fed. Cir. 1992). Courts have recognized excuses which include other litigation, negotiations with the defendant, poverty, and illness. *Id.* Here, Chatha testified that she chose not to file an EEOC complaint immediately, in 1992, after learning that she had been paid less than her colleagues, because she wanted to focus on her teaching. (Chatha Deposition at 63:9-13, 68:15-69:7). She also testified that she did not do so, because she thought that it would be "too much of a hassle[.]" (Chatha Deposition at 74:21-75:1, 102:15-19). She explained that she "didn't have the energy to . . . collect [certain documents]" that would be necessary to file the complaint. (Chatha Deposition at 102:17-19). These assertions are wholly unavailing. Plaintiff has given no reasonable explanation for waiting more than two decades before bringing allegations of pay discrimination. *See Jaso v. The Coca Cola Co.*, 435 Fed.App'x 346, 356 (5th Cir. Aug. 1, 2011) (plaintiff's delay in asserting his claim found inexcusable, because he admitted that he was aware of conduct alleged in current claim, at the time he filed previous suit against defendant); *see Nat'l Ass'n of Gov't Employee's*, 40 F.3d at 709 (death and suspension of plaintiff's attorneys found to cause inexcusable delay). Defendant has shown that, as a matter of law, Plaintiff's delay in lodging her pay claims cannot be said to be excusable.

*Prejudice*

The final prong of the laches inquiry requires the court to determine whether the party raising the defense has been prejudiced by the claimant's inexcusable delay. In other words, to decide whether the delay has "cause[d] a disadvantage in asserting and establishing a claimed right or defense." *York Group, Inc.,* 2006 WL 2883373, at *5 (quoting *Nat'l Ass'n of Gov't Employee's*, 40 F.3d at 710. The Fifth Circuit has commented that the doctrine of laches was "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Id.* (internal quotations omitted). A party claiming prejudice from delay must show prejudice, not merely assert it. *Sones v. Southern Farm Bureau Cas. Ins. Co.*, Civ. No. 98-1374, 1999 WL 195542, at * 5 (E.D. La. 1999) (citing *Fowler*, 596 F.2d at 1279) (defendant must do more than claim that necessary witnesses are no longer employed by defendant, it must show that they are unavailable as witnesses). Traditional elements of prejudice in laches include unavailable witnesses, "faded memories," changes in personnel, and loss of pertinent records. *See Nat'l Ass'n of Government Employees,* 40 F.3d at 710-11*; New Century*, 2005 WL 2453204, at *11.

Here, Prairie View claims that it has "suffered prejudice by fading memories and losing potential key witnesses." (Motion at 24). It is true that the Fifth Circuit has developed a stricter standard than other circuits regarding the prejudice required to establish laches, holding that "personnel changes or [the retirement of] employees is irrelevant unless those employees are unavailable." *E.E.O.C. v. Louisiana Power & Light Co.*, Civ. No. 88-1147, 1989 WL 35915, at *4 (E.D. La. 1989) (quoting *Bernard v. Gulf Oil Co.*, 596 F.2d 1249 (5th Cir. 1979). However, courts have also recognized the disadvantage of allowing parties to litigate a case with witnesses hampered by faded memories. *See Nat'l Ass'n of Gov't Employees*, 40 F.3d at 710-11 (noting that the few

supervisors who remembered plaintiff employee were able to offer only a general description of his performance).

In this case, more than twenty years have elapsed since Chatha first learned that she was being paid less than her colleagues. (Chatha Deposition at 64:25-65:12). More than *twenty-five years* have passed since she initially suspected discrimination in her compensation. (*Id*. at 61:10-62:5). Even if the University was able to locate the department heads that initially determined Plaintiff's salary, it is unlikely that they would be able to recall the specific circumstances surrounding those decisions. Likewise, those department heads who set Chatha's subsequent salaries, as well as the department heads who set the salaries for her purported comparators, will experience difficulty in recalling the specific reasons for setting the pay of a particular University employee. Moreover, the University has long since discarded the personnel files of four professors who Plaintiff alleges are comparators to her. (Ayyar Declaration at 2). Without these records, the University is at a distinct disadvantage in presenting its case. On this record, the combined effect of Plaintiff's delay in bringing her claims and the resulting prejudice to the University requires that her claims be dismissed. *Armco, Inc*., 693 F.2d at 1160; *Nat'l Ass'n of Gov't Employees*, 40 F.3d at 710-11(deficiency in witness' testimony posed a hindrance to defendant's ability to litigate its case); *Morgan*, 536 U.S. 101, 121, 122 S.Ct. 2061 (citing *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 373, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977) ("[] a defendant in a Title VII enforcement action might [] be significantly handicapped in making [its] defense because of an inordinate [] delay in filing the action[].").

In sum, Plaintiff cannot establish a *prima facie* case of wage discrimination, because she has failed to identify any similarly situated employees who were paid more than she. Any claims based on a pay disparity with Dr. Freeman, Mr. Chapman, Mr. Minner, or Dr. Bailey are barred, because they were not working at the University between March 27, 2011, and June 1, 2012. Dr. Booker and

Dr. Foster, likewise, were not similarly situated to Chatha, because they worked in different departments, under different supervisors, and performed different work. For those reasons, it is recommended that Plaintiff's claims be dismissed.

But, even had Plaintiff made a *prima facie* case of discrimination, it is recommended, in the alternative, that this case be dismissed under the doctrine of laches. For these reasons, the court recommends that Defendant's motion for summary judgment be granted.

### Conclusion

Accordingly, it is **RECOMMENDED** that Defendant's Motion to Dismiss is **GRANTED,**

It is further **RECOMMENDED** that Plaintiff's claims be **DISMISSED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 10th day of August, 2016.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**